Filed 1/28/25  P. v. Spencer CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>VICTOR SPENCER,<br><br>    Defendant and Appellant. | B331308<br><br>(Los Angeles County<br>Super. Ct. No. BA050609) |

APPEAL from an order of the Superior Court of Los Angeles County, Sam Ohta, Judge.  Affirmed.

Elana Goldstein, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Kathy S. Pomerantz, Deputy Attorneys General, for Plaintiff and Respondent.

—————————

In 1991, Victor Spencer participated in setting a fire that killed five people. A jury convicted Spencer of multiple counts of first degree murder with true findings on special circumstance allegations. The trial court sentenced him to life without parole. Years later, Spencer petitioned for resentencing under Penal Code section 1172.6,[1] which limited accomplice liability for murder. After an evidentiary hearing under that section, the trial court found that Spencer was a major participant in a felony who acted with reckless indifference to human life and denied the petition. Spencer now appeals from the trial court's order denying his petition, contending there was insufficient evidence to support the trial court's findings. We disagree and affirm the order.

## BACKGROUND

I.    Evidence at the trial of Spencer and Harold Mangram for murder and arson

Spencer was jointly tried with Harold Mangram for murder and arson. A third participant in the crimes, Frank Villareal, pled guilty to five counts of voluntary manslaughter and testified at Mangram and Spencer's trial.

A.    *The fire*

In September 1991, Juan Zuniga was living with 16 family members in Unit 481, a two-story apartment in the Jordan

---

[1]    All further undesignated statutory references are to the Penal Code.

Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

2

Downs complex. The family had problems with drug users who would hang out near their front door and harass the family. Zuniga's wife had to wash her porch daily because people would urinate on it. She complained to the housing authority twice a week.

Zuniga slept downstairs in the kitchen with his wife and three children. Just before 6:00 a.m. on the morning of September 7, 1991, Zuniga heard a noise. He went outside and saw three men near his front door. One man was a bit further away from the other two men. Zuniga went back inside and got his gun, but he then smelled gas and felt a flame. Gasoline was coming through the front door mail slot. Zuniga went upstairs to help family members jump out of a window, not realizing other family members remained in another upstairs room. Zuniga returned downstairs, saw a man (Gregory Moore), and shot him, unaware that Moore was a neighbor who had come to help. Zuniga went outside and tried to get the rest of his family out of the apartment, but was unable to save 65-year-old Marguerite Hernandez, 22-year-old Martha Zuniga, four-year-old Juan Zuniga, four-year-old Claudia Zuniga, and one-year-old Veronica Lopez.

B.    *Roderick Garner's testimony*

Garner used to live in Jordan Downs, and he had known Mangram for 35 years, Spencer for a few years, and Villareal for a few months. Mangram was known as "Grandad" and Villareal as "Little Man." Garner, Mangram, Spencer, and Villareal abused drugs.

The day before the fire, Mangram told Garner that he had a job for him and asked Garner to get gasoline. Garner agreed, thinking they would be "burning" someone out to get dope.

3

Garner asked if he could be the one to throw the gasoline. Garner also thought they were just going to scare people, and nobody was supposed to get hurt. Later that night, Garner unsuccessfully tried to siphon gasoline from cars.

About 20 or 30 minutes before the fire started, Garner saw Mangram and Spencer at base station,[2] a vacant house used as a "dope house." At the preliminary hearing, Garner testified that when he was at base station, Mangram told Spencer to get gasoline. At trial, however, Garner retracted that testimony, saying he had lied at the preliminary hearing. Garner also saw on a porch a couple of houses away a plastic milk container filled with a goldish-brown liquid, which he later learned was gasoline. Spencer showed the container to Mangram by gesturing to it. Spencer and Mangram walked in the direction of Zuniga's apartment, and Garner noticed that the container was no longer on the step.

About 15 or 20 minutes before the fire broke out, Garner saw Villareal riding a bike in a parking lot west of Zuniga's apartment.

About 15 or 20 minutes after the fire broke out, Mangram knocked on Garner's door, and when Garner opened it, he could hear screaming and hollering. However, Garner gave statements to the police that Mangram *and* Spencer came to his door, Mangram smelled of gasoline, and Mangram changed his shirt while Spencer left. After seeing the fire, Garner wandered to another apartment near base station. Spencer was at this

---

[2] The dope house is referred to as bay station and base station in the record.

4

apartment with another person, and they were packing their things to leave.

C.     *Villareal's testimony*

Villareal testified that he saw Mangram the morning before the fire.  Mangram said he was going to make some money, and he had an empty plastic milk container.

Villareal saw Spencer later that night, around 6 or 7 p.m., on a street next to the projects.  Spencer was riding a bicycle, and he let Villareal ride it.  Two hours later, Villareal saw Spencer sitting on a porch with two women.  Mangram came around the corner and left.

Sometime around 2 or 3:00 a.m., Villareal saw Spencer with Mangram, who was holding an empty plastic container.  Spencer and Mangram walked in the direction of Zuniga's apartment.  About an hour later, Villareal saw Spencer and Mangram on Zuniga's front porch trying to pour liquid from the container through the mail slot.  Villareal helped them by tearing a piece of cardboard off a nearby box, bending it, inserting the cardboard into the mail slot, and holding it as Mangram funneled gasoline through the mail slot.  Spencer was holding a cigarette lighter.  At that point, someone inside the apartment said something, so Villareal ran away.  Villareal did not plan to kill anyone.

About an hour later, Villareal saw Mangram and asked if he had anything.  Mangram gave him a rock of cocaine.  A bit later, Villareal saw Spencer at a bus stop, and Spencer said he was never coming back to the projects.  Villareal asked Spencer if he had any dope, and Spencer said no.

D.  *Gregory Moore's testimony*

For the months prior to the fire, Moore had been staying with his sister at Jordan Downs.  On the morning of the fire, Moore was up early, preparing to go to work when he saw smoke coming out of Zuniga's apartment.  Looking out his window, he saw Mangram and Spencer in the parking lot, and Mangram was holding a red and yellow gas can.[3]  Moore went into Zuniga's apartment to help, but Zuniga shot him.

Moore later told the police that one of the men he saw that night wore a Raiders jacket.

E.  *Expert testimony*

An arson investigator testified that the fire was reported at 6:09 a.m. and was extinguished 12 minutes later.  The investigator determined that the fire was intentionally set and that just under one gallon, to perhaps slightly over two gallons, of a flammable combustible liquid had been poured through the mail slot and ignited with an open flame device.  The fire then progressed quickly, producing a toxic smoke that shuts out light and causes disorientation within seconds of breathing it and loss of consciousness seconds later.

II.  Verdict and sentence

A jury found Spencer guilty of five counts of first degree murder with true findings on special circumstance allegations that he committed the murders while engaged in arson of an inhabited structure.  (§§ 187, subd. (a), 190.2, subd. (a)(17).)  The

---

[3]  Moore had testified at preliminary hearing that Spencer had the can.

6

jury also found him guilty of arson causing great bodily injury to the five victims.[4] (§ 451, subd. (a).) In 1994, after a penalty phase, the trial court sentenced Spencer to five life without parole terms.

III.    Postconviction petition for resentencing

In March 2022, Spencer petitioned for resentencing under section 1172.6. The People agreed that Spencer made a prima facie case for relief, so the trial court scheduled an evidentiary hearing. At the evidentiary hearing, the parties submitted on the reporter's and clerk's transcripts from the underlying trial and stipulated to enter into evidence two exhibits, a transcript of Moore's initial statement to the police and a police report about that statement. The parties also stipulated to entering into evidence the testimony of Ahmad Spencer (no relation to defendant) as follows: Ahmad Spencer (1) knew Mangram, Spencer, and Villareal before the murders, (2) frequently saw Villareal wearing a Raiders jacket, and (3) Villareal was wearing that jacket at about 10 to 11 a.m. on the morning of the fire.

After hearing the parties' arguments, the trial court framed the issue as whether Spencer could now be convicted of murder as (1) the actual killer, (2) an aider and abettor who acted with intent to kill, or (3) a major participant who acted with reckless indifference to human life.[5] First, the trial court found there was

---

[4]    The jury found Mangram guilty of the same crimes and special circumstance allegations.

[5]    Spencer had argued that he was entitled to resentencing because a witness misidentified him and Villareal's testimony was not credible. The trial court rejected these arguments

no evidence beyond a reasonable doubt that Spencer was the actual killer because the evidence was open to the reasonable interpretation that Mangram *or* Spencer lit the fire. Second, the trial court could not find beyond a reasonable doubt that Spencer harbored express malice when committing the arson.

Turning to the third theory of liability, however, the trial court found beyond a reasonable doubt that Spencer was a major participant in the arson who acted with reckless indifference to human life. The trial court found that Spencer helped plan the arson by showing the container filled with gasoline to Mangram, obtaining gasoline, being present while the gasoline was being poured into the apartment, failing to restrain his accomplices, and either lighting the fire or giving the lighter to Mangram to light it. Based on these factors, the trial court found that Spencer was a major participant in the arson. Turning to the reckless indifference prong, the trial court found that Spencer knew most, if not all, of the apartment's residents would be asleep. Setting fire to an apartment at that time of day therefore was "an act that involved grave risk of death to many innocent human beings. . . . [¶] The only reasonable and rational circumstantial inference is that [Spencer] acted with reckless indifference to human life."

The trial court accordingly denied Spencer's petition.

---

because they had "nothing to do with changes to section 188 or 189." Spencer does not address the trial court's ruling on that ground, although he continues to assert that Villareal's testimony cannot support the trial court's order because that testimony was not credible.

## DISCUSSION

I.     Senate Bill No. 1437

To the end of ensuring a person's sentence is commensurate with the person's individual criminal culpability, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) limited accomplice liability under the felony-murder rule, eliminated the natural and probable consequences doctrine as it relates to murder, and eliminated convictions for murder based on a theory under which malice is imputed to a person based solely on that person's participation in a crime.  (See generally *People v. Reyes* (2023) 14 Cal.5th 981, 986; *People v. Lewis* (2021) 11 Cal.5th 952, 957, 959; *People v. Gentile* (2020) 10 Cal.5th 830, 842–843.)  As relevant here, Senate Bill 1437 amended the felony-murder rule by adding section 189, subdivision (e), which provides that a participant in the perpetration of qualifying felonies is liable for felony murder only if the person (1) was the actual killer, (2) was not the actual killer but, with the intent to kill, acted as a direct aider and abettor, or (3) the person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in section 190.2, subdivision (d).  (*Gentile*, at p. 842.)

Senate Bill 1437 also created a procedure, codified at section 1172.6, for a person convicted of murder under the former law to be resentenced if the person could no longer be convicted of those crimes under the current law.  (*People v. Lewis, supra*, 11 Cal.5th at p. 959; *People v. Gentile, supra*, 10 Cal.5th at p. 847.)  A defendant commences that procedure by filing a petition containing a declaration that, among other things, the defendant could not presently be convicted of murder under the current law. (*People v. Strong* (2022) 13 Cal.5th 698, 708.)

9

If a petition establishes a prima facie case for relief, the trial court must appoint counsel if requested, issue an order to show cause, and hold an evidentiary hearing at which the parties may offer new or additional evidence and the trial court sits as an independent factfinder to determine beyond a reasonable doubt whether the defendant is guilty of murder under a valid theory. (§ 1172.6, subds. (b)(3), (c), & (d)(1); *People v. Garrison* (2021) 73 Cal.App.5th 735, 745.)

II.     Standard of review

On appeal, we review the trial court's findings after a section 1172.6, subdivision (d)(3), evidentiary hearing for substantial evidence. (*People v. Clements* (2022) 75 Cal.App.5th 276, 298; accord, *People v. Mitchell* (2022) 81 Cal.App.5th 575, 591 (*Mitchell*).) Under that standard of review we " ' "examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the defendant guilty] beyond a reasonable doubt." ' " (*Clements*, at p. 298.) We presume in support of the judgment the existence of every fact that can be reasonably deduced from the evidence. (*People v. Owens* (2022) 78 Cal.App.5th 1015, 1022 (*Owens*).) We do not resolve credibility issues or evidentiary conflicts. (*Ibid.*) Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57.) Before we may set aside a trial court's order, it must be clear that " ' "upon no hypothesis whatever is there sufficient substantial evidence to support [it]." ' " (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

10

III.   *Banks/Clark* factors

The trial court found Spencer guilty of felony murder as a major participant in a felony who acted with reckless indifference to human life under current law.  This area of law has its genesis in two United States Supreme Court cases:  *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137.  *Enmund* held that the death penalty could not constitutionally be imposed on an armed robbery getaway driver who was a minor participant in the crime, was not present when the murder was committed, and had no intent to kill.  (*Enmund*, at pp. 798, 801.)

In contrast, *Tison v. Arizona, supra,* 481 U.S. at page 139, did not preclude imposing the death penalty for two defendants, brothers, who had helped their father and his cellmate—both convicted murderers—escape from prison.  The defendants gave them guns, and the group later kidnapped a family of four.  The defendants then stood by while their father debated whether to kill the family and proceeded to shoot the family, including a toddler and a teenager.  (*Id.* at pp. 139–141.)  The court held that the Eighth Amendment does not prohibit imposing the death penalty on a nonkiller who lacked the intent to kill, but whose "participation [in the crime] is major and whose mental state is one of reckless indifference to the value of human life."  (*Id.* at p. 152; see also *id.* at pp. 157–158.)

Years later, in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), our Supreme Court addressed *Enmund* and *Tison* and substantially clarified the "major participant" and "reckless indifference to human life" requirements.  *Banks*, at page 794, considered "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant."  The court listed various

11

factors that should be considered in making that determination: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Id.* at p. 803, fn. omitted.)

The court then turned its attention to "reckless indifference to human life" in *Clark*.  Reckless indifference to human life is " 'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.' "  (*Clark, supra*, 63 Cal.4th at p. 616.)  It "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions."  (*Id.* at p. 617.)  Recklessness has both a subjective and an objective component.  (*Ibid.*)  Subjectively, the defendant must consciously disregard risks known to him.  Objectively, recklessness is determined by "what 'a law-abiding person would observe in the actor's situation,' " that is, whether defendant's conduct " 'involved a gross deviation from the standard of conduct that a law-abiding person in the actor's situation would observe.' "  (*Ibid.*)

*Clark* listed factors to consider when determining whether reckless indifference existed:  "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at

the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*In re Scoggins* (2020) 9 Cal.5th 667, 677 (*Scoggins*) [summarizing *Clark* factors].)

In evaluating the sufficiency of evidence to support a trial court's finding that the *Banks/Clark* factors are established, no one factor " 'is necessary, nor is any one of them necessarily sufficient.' " (*Clark*, *supra*, 63 Cal.4th at p. 618.) Rather, we evaluate the factors under the totality of the circumstances to determine a petitioner's place on the culpability spectrum. (*Scoggins*, *supra*, 9 Cal.5th at p. 675.)

IV.     Sufficiency of the evidence to support finding that Spencer was a major participant in a felony who acted with reckless indifference to human life

Spencer contends there was insufficient evidence to support both prongs of the *Banks/Clark* analysis; that is, he was neither a major participant in the arson nor did he act with reckless indifference to human life. We disagree.

A.     *Major participant prong*

The first factor we consider in evaluating the sufficiency of the evidence that Spencer was a major participant in the arson is his role in planning it. (*Banks*, *supra*, 61 Cal.4th at p. 803.) As Spencer points out, the evidence tends to show that Mangram was the arson's mastermind. Even so, while being a crime's mastermind would certainly weigh heavily in favor of the major

13

participant prong (see, e.g., *Clark*, supra, 63 Cal.4th at p. 612), Spencer cites no authority for the notion that one must be the mastermind to be a major participant. Instead, we consider the totality of circumstances. (*Banks*, at p. 802.) And here, the trial court found that Spencer helped plan the arson because he showed the container of gasoline to Mangram. Thus, there was some evidence that Spencer was involved in planning the arson, even if he did not mastermind it. In any event, even if this single factor does not weigh heavily in favor of the major participant prong, we must still consider the other *Banks* factors.

The next factor we therefore consider is Spencer's role in supplying the lethal devices, here the gasoline and the lighter. There was evidence Spencer supplied the gasoline. Mangram had asked Garner to get gasoline, but Garner was unable to siphon gasoline from cars. This raised a reasonable inference that Mangram turned to someone else to get gasoline. Garner testified at the preliminary hearing that Mangram told Spencer to get gasoline. Although Garner said at trial that he had lied at the preliminary hearing, the trial court was entitled to credit Garner's preliminary hearing testimony. Garner also testified that he saw a container of gasoline on a porch and saw Spencer gesture toward it in a way to show Mangram where it was. This further buttressed a finding that Spencer obtained the gasoline; otherwise, why would Spencer have to show Mangram where the gasoline was? Spencer and Mangram then walked in the direction of Zuniga's apartment, and Garner noticed that the container was no longer on the porch. As for the lighter, Villareal testified that Spencer had it on the porch just before the fire was set. It is therefore reasonable to infer that Spencer also supplied the lighter based on his possession of it on the porch.

14

The third *Banks* factor is whether Spencer was aware of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants. It is more than reasonable to infer that Spencer knew that pouring gasoline into an occupied two-story apartment and lighting the gasoline on fire was extremely dangerous. By its very nature, setting fire to an inhabited structure cannot be committed without creating a substantial risk someone will be killed, and therefore the act is inherently dangerous. (*People v. Nieves* (2021) 11 Cal.5th 404, 464.)

Fourth, the evidence showed that Spencer was at the scene of the killings, in a position to facilitate or prevent them, and his actions played a role in the deaths. Spencer was with Mangram on Zuniga's porch, helping Mangram pour gasoline through the mail slot. And given that Spencer possessed the lighter while on Zuniga's porch, it is reasonable to infer he played perhaps the most critical role in furtherance of the crimes: lighting the gasoline.

In sum, substantial evidence of Spencer's role in obtaining the gasoline, helping Mangram pour it into Zuniga's apartment, and lighting the gasoline on fire supported the trial court's finding that Spencer was a major participant in the arson.

Spencer's primary response to the evidence supporting the trial court's finding on the major participant prong is that it was contradictory, open to interpretation, and based on unreliable witnesses. Spencer thus argues that even if there was evidence Mangram asked him to get gasoline, it is unclear that Spencer followed that instruction or knew what use Mangram had planned for the gasoline, which Spencer notes has "many other non-deadly uses." Spencer also argues that Villareal was not

credible because, for example, he had a criminal record,[6] he abused drugs, his plea agreement gave him a motive to lie, he lied to law enforcement when initially interviewed in this case, and he was equally culpable in these murders because he helped pour the gasoline through the mail slot.

The trial court, however, was well aware of the evidence at the criminal trial and of any issues regarding Villareal's credibility, having reviewed the trial transcripts. As the independent trier of fact at the evidentiary hearing (§ 1172.6, subd. (d)(3)), its role was to determine whether Spencer could be convicted of murder under current law beyond a reasonable doubt. In that role, the trial court was entitled to weigh the evidence and make credibility findings. Our role on appeal, however, is to review the trial court's findings for substantial evidence, meaning we may not reweigh the evidence or make credibility findings. (*People v. Clements*, *supra*, 75 Cal.App.5th at p. 298; accord, *Mitchell*, *supra*, 81 Cal.App.5th at p. 591; *Owens*, *supra*, 78 Cal.App.5th at p. 1022.) We therefore decline to find Villareal not credible or resolve evidentiary conflicts in Spencer's favor. Instead, the evidence being more than sufficient to support the trial court's finding that Spencer was a major participant in the crime, we must affirm it.

B.     *Reckless indifference to human life prong*

Moving to the second prong of the inquiry, the same factors that support the trial court's finding on the major participant prong support its finding that Spencer acted with reckless

---

[6]     Villareal's criminal history included stabbing a sheriff's deputy while incarcerated for these crimes. His plea bargain included resolving the charges for stabbing the deputy.

16

indifference to human life.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 615 [significant overlap exists between factors establishing two prongs].)

That is, the first *Clark* factor, Spencer's knowledge that lethal weapons would be used, heavily supports the trial court's reckless indifference finding.  Spencer personally used and knew that a lethal "weapon"—gasoline and a lighter—would be used during the felony.  (See generally *Clark*, *supra*, 63 Cal.4th at p. 17.)  The evidence shows that Spencer obtained gasoline, helped Mangram pour it through the mail slot, and then lit the gasoline on fire.  Moreover, Spencer was with Mangram at all crucial steps of these crimes.  Garner saw them together at base station 20 or 30 minutes before the fire started.  Spencer and Mangram then walked in the direction of Zuniga's apartment.  Villareal saw Spencer and Mangram at Zuniga's apartment, trying to pour gasoline through the mail slot.  Fifteen or 20 minutes after the fire broke out, Mangram knocked on Garner's door, and, according to Garner's preliminary hearing testimony, Spencer was with him.  Therefore, there was evidence that Spencer was with Mangram before, during, and after the arson. (See, e.g., *Mitchell*, *supra*, 81 Cal.App.5th at p. 592 ["Mitchell was physically present at every stage of the crime:  planning, execution, dividing the spoils, and flight."].)

Yet, there is no evidence that at any point Spencer tried to restrain Mangram or Villareal.  Instead, Spencer helped Mangram pour gasoline through the mail slot, and Spencer either lit the gasoline on fire or gave the lighter to Mangram so that Mangram could light the gasoline on fire.  This exhibited a reckless indifference to human life.  (Compare *People v. Bascomb* (2020) 55 Cal.App.5th 1077, 1089 [defendant enabled murder by

17

using gun to keep victims at bay during bank robbery], with *Scoggins, supra,* 9 Cal.5th at p. 679 [quickness of shooting suggested defendant lacked control over accomplices' actions]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 989 [defendant lacked meaningful opportunity to intervene when he and shooter were on opposite sides of victim's car, and attempted carjacking was quickly executed]; *In re Moore* (2021) 68 Cal.App.5th 434, 452 [defendant present during robbery but not " 'close enough' " to restrain shooter].)

There is also no evidence Spencer tried to minimize the risk of violence. To the contrary, Spencer committed the arson in the early morning when the apartment's occupants were home and likely asleep, and therefore particularly vulnerable. Moreover, when Zuniga heard a noise at his front door, he went outside and saw the arsonists, so it is reasonable to infer that they saw him. Therefore, Spencer could not have doubted that someone was in the apartment when he lit the fire. Also, Spencer and Mangram poured one to two gallons of accelerant into the apartment, causing a quick burning fire and toxic smoke which would have promptly disabled the apartment's occupants. Spencer therefore committed the arson in a manner designed to maximize the risk of violence. (Compare *Owens, supra,* 78 Cal.App.5th at p. 1024 [bank robbery posed high risk of violence because it occurred during business hours with 20 people present and robbers were armed], with *Clark, supra,* 63 Cal.4th at pp. 621–622 [plan to rob closed store minimized risk of violence]; *Scoggins, supra,* 9 Cal.5th at p. 677 [defendant's plan to beat victim and steal his money did not involve use of weapons].)

Next, there is little direct evidence that Spencer knew about any propensity for violence Mangram might have had.

(See generally *People v. Nieber* (2022) 82 Cal.App.5th 458, 479 [although Nieber did not know about cohorts' likelihood of killing, he knew they brought a weapon and were using it]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025 [finding " 'significant' " the lack of evidence that the petitioner knew of his confederates' "violent propensities"].)  However, Spencer and Mangram abused drugs and needed money.  Garner said that when Mangram asked him to get gasoline, Garner understood that they were going to burn someone out to get dope.  Villareal similarly testified that he had previously seen houses burned down in Jordan Downs.  Garner's and Villareal's testimony therefore raised a reasonable inference that setting fire to people's homes had happened before at Jordan Downs, and Spencer, as someone who frequented Jordan Downs, may have known of that practice.

The next factor we examine is the crime's duration, because there is generally a greater opportunity for violence when victims are restrained for prolonged periods.  (*Clark*, *supra*, 63 Cal.4th at p. 620.)  This crime differs from the more usual murder occurring during the course of an armed robbery.  This crime involved Spencer and Mangram lighting a fire from outside Zuniga's apartment, and therefore there was no "restraint" of the victims as might occur during a robbery.  Even so, Spencer lit fire to a confined space, a two-story apartment from which it would not be easy for the victims, especially the ones asleep upstairs, to escape.  Thus, although the victims were not restrained by, for example, rope or at gunpoint, they were nonetheless restrained by virtue of being in a dwelling lit on fire, which would quickly cut off escape routes.  Moreover, *Clark* considered that the longer a crime lasts, the chance of violence increases.  But in the case of

19

arson, a longer duration is unnecessary to increase the violence. Indeed, a point of arson may be that fire spreads quickly.

There is no evidence Spencer tried to help the apartment's occupants. If he had no intent to kill and intended just to scare the apartment's occupants, he still had the opportunity to help Zuniga and his family get out of the apartment once he saw the extent of the fire. Instead, unlike Zuniga's neighbor Moore, Spencer packed up his things and left. Such callous behavior supports the reckless indifference finding. (See, e.g., *Clark*, *supra*, 63 Cal.4th at p. 619; *In re Parrish* (2020) 58 Cal.App.5th 539, 544 [reckless indifference shown by failure to aid or comfort victim]; *People v. Douglas* (2020) 56 Cal.App.5th 1, 10 [petitioner "displayed no interest in moderating violence or in aiding his bloody and suffering victim," and instead picked his pocket].)

Spencer's reliance on *In re Taylor* (2019) 34 Cal.App.5th 543 to support his argument that his flight and failure to help the victims did not evidence a reckless indifference to human life is misplaced. In that case, the defendant fled the scene despite knowing that the victim had been shot. (*Id.* at p. 559.) There was no evidence the defendant knew how badly the victim was wounded, and there was evidence the defendant thought help was arriving. (*Ibid.*) In contrast, Spencer knew, or it is reasonable to infer he knew, that Zuniga's two-story apartment was on fire, there were people inside, and time was of the essence to help people escape. Indeed, Garner testified that when Mangram and Spencer came to his door 15 or 20 minutes after the fire started, Garner could hear screaming and hollering. Despite hearing this, Spencer still did not help the victims.

Substantial evidence therefore supports the findings that Spencer knew lethal items (gasoline and a lighter) would be used,

helped pour the gasoline and light it on fire or gave the lighter to Mangram, did not try to restrain his accomplices or aid the victims, and performed the arson in a way designed to maximize violence. Accordingly, substantial evidence supports the trial court's ultimate finding that Spencer was a major participant in the arson who acted with reckless indifference to human life.

## DISPOSITION

The order denying Victor Spencer's Penal Code section 1172.6 petition is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

HANASONO, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21